UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Application of<br><br>OWH SE i.L.<br><br>For an Order Pursuant to 28 U.S.C. § 1782 To Conduct Discovery for Use in a Foreign Proceeding | No. 3:26-mc-20 (BKS/CBF) |

# DECLARATION OF MEIKE VON LEVETZOW

I, Meike von Levetzow, hereby make this Declaration pursuant to 28 U.S.C. § 1746:

1. I am a lawyer admitted to the Berlin Bar and a Partner at Noerr Partnerschaftsgesellschaft mbB in Berlin, Germany (“**Noerr**”). I submit this declaration in support of the application of OWH SE i.L. for an order pursuant to 28 U.S.C. § 1782 to conduct discovery for use in a foreign proceeding.

2. I have been assisted in drafting this Declaration by MoloLamken LLP, a law firm in the United States. The following is based on my personal knowledge or on documents which I have reviewed and is true and correct to the best of my knowledge.

## I. Background

3. Noerr was engaged by OWH SE i.L. (formerly known as VTB Bank (Europe) SE) (“**OWH**”) as its counsel in arbitration proceedings between OWH, RTI Limited (Jersey) (“**RTI**”) and United Company Rusal, International PJSC (Russia) (“**Rusal**”). Currently, Noerr supervises the global enforcement actions undertaken by OWH against RTI and Rusal. I have been part of the Noerr team advising OWH since January 2023. Attached as Exhibit A is a chart my team prepared on 15 May 2026 depicting, to the best of our current knowledge, the relationships between Rusal and certain related entities (now and in September 2024).

4. The arbitration giving rise to the Award was seated in London, governed by English law, and conducted under the LCIA Arbitration Rules 2020 (“**Arbitration**”). The dispute arose from USD-RUB currency transactions between OWH and RTI which were governed by an ISDA Master Agreement (“**ISDA Agreement**”) that was entered into on 11 September 2019, as well as further documents regarding each transaction. RTI’s obligations to OWH under the ISDA Agreement were guaranteed by Rusal under a guarantee and indemnity also dated 11 September 2019.

5. Following Russia’s full-scale invasion of Ukraine, international sanctions were imposed on Russian entities in or around February 2022. Subsequently, RTI defaulted on its payment and settlement obligations under the ISDA Agreement, which led to a dispute between OWH and RTI. OWH issued notices to RTI to remedy the default. However, RTI did not do so. Nor did Rusal satisfy its obligations as the guarantor.

6. The dispute eventually culminated in the Arbitration. OWH was both the “respondent” in the Arbitration (as against RTI, which had initiated the arbitration) and the “claimant” (as against RTI and Rusal).

7. OWH was ultimately successful in the Arbitration: Pursuant to an arbitral award dated 25 September 2024, amended by an addendum for computational error on 12 November 2024 (“**First Award**”), OWH was awarded the sum of EUR 213,770,150.26 against Rusal and its affiliate RTI. The tribunal issued a second award in relation to the payment of interest and costs (“**Second Award**”), ordering RTI and Rusal to pay further EUR 33,835,208.30, plus further accrued interest, as well as costs of EUR 2,044,9087 and GBP 3,815,586.60. I refer to the First and the Second Award together as the “**Awards**”.

8. Despite multiple requests from OWH, the Awards have not been paid by Rusal or RTI as of the date of this Declaration. For this reason, and as explained in more detail below, OWH has initiated enforcement proceedings in several jurisdictions, seeking to enforce the Awards against Rusal and/or RTI assets. Despite OWH's extensive and sustained efforts, enforcement has yielded only minimal recoveries and has been met with a coordinated pattern of resistance, procedural obstruction, and asset reorganization by RTI and Rusal and its subsidiaries. Recognition and enforcement in the Russian Federation is not possible.

## II. OWH is fully insulated from VTB Bank and not subject to sanctions

9. OWH is a subsidiary of VTB Bank PJSC, which is incorporated in the Russian Federation ("**VTB Russia**"). Following the Russian invasion of Ukraine in February 2022, VTB Russia was sanctioned in various European jurisdictions and consequently, the German Federal Financial Supervisory Authority, Bundesanstalt für Finanzdienstleistungsaufsicht ("**BaFin**"), imposed a series of measures to separate OWH and its assets from VTB Russia and its related VTB group of companies ("**VTB group**"). These measures included the following:

a. On 17 February 2022, BaFin appointed a special representative from Deloitte to monitor OWH's payment decisions.

b. On 24 February 2022, the day of the Russian invasion of Ukraine, BaFin made an order banning OWH from making payments or asset transfers to VTB Russia or the VTB group which were detrimental to OWH. In

consequence, OWH put in place internal measures to prevent payments to VTB Russia or the VTB group.

c. On 27 February 2022, BaFin banned OWH from granting loans or accepting deposits or disbursing any contractually agreed but not yet fully disbursed loans. OWH was also banned from making payments or other transfers of assets for the benefit of Russian credit institutions.

d. On 9 April 2022, BaFin made orders requiring OWH's management not to accept or implement any instructions from VTB Russia. BaFin confirmed this order by letter dated 4 December 2022.

e. On 19 May 2022, BaFin appointed a special representative with management board functions and executive powers at OWH.

f. On 8 June 2022, the Frankfurt am Main District court ordered that a trustee be appointed to exercise VTB Russia's voting rights in relation to OWH.

10. These measures mean that OWH is completely insulated from its Russian parent company and its group.

11. Further, OWH itself is currently not subject to any sanctions. In the United Kingdom, Jersey, or the European Union, OWH has never been designated a sanctioned entity.

12. In the United States, the United States Office of Foreign Assets Control ("**OFAC**") on 2 April 2024 removed OWH from the List of Specially Designated Nationals and Blocked Persons ("**SDN List**"), after having listed it on 24 February 2022 pursuant to Executive Order 14024. By removing OWH from the SDN List on 2 April 2024, OFAC

has confirmed that OWH is no longer subject to the blocking provisions of Executive Order (E.O.) 14024, "Blocking Property With Respect To Specified Harmful Foreign Activities of the Government of the Russian Federation".

**III. Rusal's obstructive transactions**

13. RTI and Rusal have not paid the amounts owed to OWH under the Awards. Consequently, OWH undertook enforcement steps in different jurisdictions, where Rusal and/or RTI held assets, whilst facing obstructive transactions to the enforcement and attempts to dissipate assets by RTI and Rusal.

14. This has included extensive corporate restructuring and other dealings by Rusal and its subsidiaries resulting in significant assets being transferred from enforcement friendly jurisdictions (e.g. the EU and Jersey) to less accessible jurisdictions (e.g. Russia and Qatar), or otherwise being placed beyond the reach of enforcement.

15. As OWH was advised by Russian counsel, enforcing arbitral awards in Russia would be practically impossible where – as is the case here – the seat of the arbitration is England and/or the arbitral tribunal comprises British nationals, especially by a non-Russian entity against a Russian company. This is because England is considered an "unfriendly" country under the current Russian legal regime and there is a presumption of bias against arbitrators of such an "unfriendly" country.

16. RTI is an indirect subsidiary of Rusal. The Royal Court of Jersey granted OWH's winding-up petition in January 2026. RTI had been in provisional liquidation since July 2025. In a final judgment dated 8 August 2025, the Jersey court upheld the appointment of provisional liquidators to RTI due to concerns that RTI had been asset-stripped

after the chairman of the tribunal in the Arbitration notified the parties that the Award was likely to be issued by the end of September 2024.

**1. Transfer of Rusal's shares in Libertatem Materials to AL Plus Holding**

17. Ultimately after the commencement of the arbitration proceedings, specifically on 18 December 2023, Rusal transferred all 426,298 shares, with a nominal value of EUR 5,000 each and a total value of EUR 2,131,490,000.00, that it held in the Cypriot company Libertatem Materials Limited ("**Libertatem Materials**") to its subsidiary, AL Plus Holding LLC ("**AL Plus Holding**"). At this time, Libertatem Materials was the share-holder of 17 subsidiaries in Russia and in various other jurisdictions, collectively valued at c. USD 3.4 billion by Libertatem Material's 2023 Annual Report. OWH does not have any insight into the real value of these shares or evidence of consideration for these shares.

**2. Termination Agreement between Rusal Marketing and RTI**

18. On 7 January 2025, OWH obtained an attachment order from the Swiss court against, inter alia, all current and future claims and receivables to which RTI was entitled, including the proceeds of a long-term offtake agreement held by Rusal Marketing GmbH ("**Rusal Marketing**"), an agent of RTI since 1 August 2007.

19. During those proceedings, OWH learned that RTI had purportedly terminated the agency agreement with Rusal Marketing on 30 August 2024 ("**Termination Agreement**").

20. Notably, the purported Termination Agreement was executed only a few days after the Parties had been notified by the arbitral tribunal, on 14 August 2024, that the First

Award could be anticipated by the end of September 2024. As a result of the purported termination, no attachable claims existed at the time of the attachment.

21. It is worth noting that the agency agreement with Rusal Marketing has purportedly been transferred to AL Plus Global DMCC (now AL Plus Global FZCO), registered in the UAE and a direct subsidiary of AL Plus Holding, itself a Qatar-based indirect subsidiary of Rusal, as I explain below.

22. This transfer must be seen against the backdrop of a broader pattern of intra-group asset transfers. At a hearing before the Royal Court of Jersey on 17 July 2025, counsel for RTI acknowledged that, as part of a wide-ranging group restructuring, assets of approximately EUR 4.5 billion had been transferred away from RTI to other Rusal group entities.

**3. The Agency Agreement between Rusal Marketing and AL Plus**

23. This broader pattern is also evident in OWH's enforcement efforts in the Netherlands, where RTI's and Rusal's assets proved to have been shifted within the Rusal group structure in close temporal proximity to the anticipated issuance of the First Award.

24. On 15 April 2025, OWH had obtained a pre-judgment attachment order in the Netherlands in respect of any goods owned by RTI and/or Rusal stored in warehouses of two Dutch entities, namely C. Steinweg Handelsveem B.V. ("**Steinweg**") and PGS Nederland B.V. ("**PGS**").

25. Steinweg responded to the attachment order by stating that it had been informed by its client, Rusal Marketing, that Rusal Marketing was acting as the agent of AL Plus Global DMCC, and not RTI, and that a quantity of aluminum subject to the attachment to

the order was in fact owned by AL Plus Global DMCC ("**AL Plus Global**") and not RTI. Steinweg also disclosed a letter from AL Plus Trading DMCC (another UAE-based subsidiary of AL Plus Holding, now AL Plus Trading FZCO) stating that AL Plus Trading DMCC had bought RTI's "remaining stock of silicon" of 3,600 metric tons in August 2024 at an undisclosed price.

26. In support of this assertion, Rusal Marketing had sent to Steinweg a copy of the purported Agency Agreement dated 15 December 2023 ("**Agency Agreement**") by which AL Plus Global, acting as a "Principal", appointed Rusal Marketing, acting as "Agent", inter alia to sell aluminum on its behalf to European buyers. The Recitals to the Agency Agreement between AL Plus Global and Rusal Marketing state inter alia that (i) the Principal is a new principal trading company of the Rusal group which will consolidate all international sales of aluminum products of the group, including primary and alloys (see first recital) and (ii) that as part of the global restructuring of the group the Principal will replace ex-global trading company of the group – RTI (see second recital). In my opinion, it is interesting to note that the Agency Agreement predates the Termination Agreement, even though both convey exclusivity.

27. Steinweg provided a copy of the Agency Agreement to OWH's Dutch lawyers. Moreover, Steinweg was persuaded by Rusal Marketing to release the aluminum. Therefore, on 25 April 2025, Steinweg released the cargo on the grounds that it held no stocks belonging to or owned by RTI or Rusal. Similarly, PGS also responded that it did not store goods belonging to RTI, without stating whether the stored goods were owned by other companies of the Rusal group.

28. Additionally, the Dutch courts granted OWH's request for recognition of the First Award on 8 July 2025. This decision was not appealed by RTI or Rusal, and the deadline to appeal the decision has expired.

29. The enforcement proceedings and attachment orders in the Netherlands have not yielded any payment for OWH, as RTI had already dissipated the assets subject to the attachment orders to UAE-based subsidiaries of AL Plus Holding, which are all ultimately owned and controlled by Rusal.

**4. Forum Muider's redomiciliation and share allotment to Primet LLC**

30. On 21 November 2024, OWH filed recognition and enforcement proceedings against Rusal in Cyprus, together with an application for interim relief. The recognition proceedings are currently ongoing. The next directions hearing is scheduled for 8 June 2026.

31. On 26 November 2024, a freezing order was granted against Rusal in respect of Rusal's shares in the Cypriot company Miradore Enterprises Limited ("**Miradore**"), prohibiting Rusal from, *inter alia*, transferring, alienating, or reducing the value of its shares in Miradore up to the amount of EUR 213,770,150.25 ("**First Cyprus Freezing Order**"). Miradore is part of the Rusal group. Until recently, Miradore and JSC Samruk-Energy ("**Samruk**"), a Kazakh state-owned company, each held a 50% shareholding in Forum Muider Limited ("**Forum Muider**"). Forum Muider in turn wholly owns Bogatyr Komir LLP ("**Bogatyr Komir**"), which controls one of Kazakhstan's largest and most valuable coal mines. Forum Muider was (and OWH argues still is) domiciled in Cyprus.

32. On 4 June 2025, OWH was informed by its Cypriot counsel that Forum Muider had, on 30 April 2025, published in a daily newspaper a special resolution of its shareholders approving its redomiciliation, the transfer of its registered office to the Astana International Financial Centre in Kazakhstan ("**AIFC**"), and its continuation as a private company in the AIFC. Consequently, on 17 June 2025, OWH filed an application against Miradore and Forum Muider, seeking a prohibition on the disposal of their assets and on the redomiciliation of Forum Muider to the AIFC. On 1 July 2025, the injunction was granted against Miradore and Forum Muider, prohibiting Miradore from, *inter alia*, transferring its assets, namely its shares in Forum Muider, outside the jurisdiction, which thereby expressly prohibited the purported redomiciliation of Forum Muider, or otherwise acting to reduce the value of Miradore's shares in Forum Muider and Forum Muider's shares in Bogatyr Komir ("**Second Cyprus Freezing Order**").

33. On 1 August 2025, Miradore and Forum Muider filed an ex-parte application with the Supreme Court of Cyprus (i) to suspend the Second Cyprus Freezing Order and (2) for leave to file a *certiorari* petition. On 19 August 2025, the Supreme Court of Cyprus issued an order staying the operative effect of the Second Cyprus Freezing Order until the *certiorari* petition had been determined.

34. On 9 October 2025, the Supreme Court of Cyprus dismissed the *certiorari* petition. As such, the Second Cyprus Freezing Order remains in full force. Miradore and Forum Muider appealed this decision, and on 16 March 2026, the Supreme Court of Cyprus dismissed their appeal.

35. During the pendency of the *certiorari* proceedings before the Supreme Court of Cyprus, OWH learned that, on 29 September 2025, the Cyprus Registrar had given consent to redomicile Forum Muider based on an application submitted by Forum Muider. OWH learned of this development through its Cypriot counsel, who checked the files of the Registrar daily and noted that the Cyprus Registrar's consent to redomicile Forum Muider and Forum Muider's application had been published in the Registrar's files of that day.

36. On 30 September 2025, upon OWH's application for a recourse through which OWH requested to annul the Registrar's consent, the Administrative Court in Cyprus granted a preliminary injunction suspending the execution and/or enforcement of the Cyprus Registrar's consent.

37. On 14 October 2025, OWH sent a request to the Astana Financial Services Authority ("**AFSA**"), which body acts as the Registrar of Companies of the AIFC, requesting it to refrain from taking, or alternatively suspend, any further steps in the process of Forum Muider's redomiciliation. OWH's counsel in Kazakhstan received confirmation of AFSA's receipt of the letter on 18 October 2025.

38. The Administrative Court in Cyprus convened a hearing on 23 October 2025 in the proceedings in which OWH requested the annulment of the Cyprus Registrar's consent. Amongst other things that transpired at that hearing, the Cypriot Registrar indicated that, in view of the prohibitory order, it would not take any further actions regarding Forum Muider's redomiciliation. In other words, from the perspective of Cypriot law (as advised by OWH's Cypriot counsel), the redomiciliation had been stayed and could not be

completed. Currently, in these proceedings before the Administrative Court, Forum Muider has filed an application for recusal of the judge. The next directions hearing is listed for 18 May 2026.

39. Despite these steps, and the potential criminal liability which may follow under Cypriot law for breach of the existing freezing orders (as advised by OWH's Cypriot counsel), Forum Muider and/or its shareholders (Miradore and Samruk) took further actions aimed at its redomiciliation.

40. On 31 October 2025, Forum Muider appeared in the public register of the AIFC, with its status recorded as "active". According to OWH's Kazakh counsel, this means that AFSA considered the redomiciliation to have been completed. This prompted OWH's filing of the claim in the AIFC, which I describe below.

41. With Forum Muider's registration in the AIFC, as OWH was informed by the British private intelligence agency Alaco Limited ("**Alaco**") on 3 November 2025, a third shareholder suddenly appeared in the AIFC register, Primet LLC ("**Primet**"). OWH recently learned that on 24 September 2025, Miradore and Samruk had apparently consented to an allotment of new (authorized) shares in Forum Muider to Primet. This purportedly resulted in Primet acquiring a 30% interest in Forum Muider and in Miradore's and Samruk's interests in the company correspondingly being reduced to 35% each. Until that date, Miradore and Samruk each had owned 50% of the shares in Forum Muider, and this is still the status in the Cypriot company register. Interestingly, Primet had only been established in July that year, two months before the allotment.

42. As OWH is advised by its Cypriot counsel, the redomiciliation and the share allotment to Primet led to a diminution in value of Miradore's shares in Forum Muider. Given that Miradore's sole asset is its shareholding in Forum Muider, the value of Miradore is directly dependent on the value of Forum Muider's participation in Bogatyr Komir and, on the asset of that entity, the coal mine. A valuation from APC Audit Tax Advisory Limited, obtained by OWH, addresses that diminution in value in the event of redomiciliation. It shows that merely by redomiciling, Forum Muider would lose between 13% and 22% of its value, corresponding to a reduction in Miradore's equity value of between USD 25.5 million and USD 59.6 million.

43. In relation to the share allotment, as OWH is advised by its Cypriot counsel, even assuming that Primet paid "fair value" for the 30% shareholding, that would not automatically mean there was no diminution of Miradore's shareholding. Even if Primet paid an amount equal to the per-share value, Miradore's shareholding was diluted from 50% to 35%. This would mean loss of control, and of blocking power and veto rights, as well as reduced influence over strategy, reduced dividends and reduced attractiveness to a third-party purchaser (including an enforcement buyer). As a result, Miradore's stake is less valuable and less marketable than before. Further, an injection of fresh capital into a company will rarely (and in this case could not) equate to a commensurate increase in value of the existing shareholders' shares. The company will have additional working capital, but there is no guarantee that it will use that capital in a way that enhances the value of the company for its shareholders.

44. Independently thereof, OWH has strong indications that the price Primet paid for the allotted share was a significant undervalue. *See infra* ¶¶ 56-65. This is contested in the AIFC proceedings.

## IV. Foreign Proceedings

45. OWH has (further) attempted to enforce the Award in numerous jurisdictions, including Qatar, England & Wales, Jersey, Austria, Switzerland, the Netherlands, Germany, Cyprus, Hong Kong, India, and Kazakhstan, but to date – beyond obtaining several freezing injunctions – has been unsuccessful in finally enforcing the Awards.

### 1. Enforcement in Kazakhstan

46. On 7 November 2025, prompted by Forum Muider's registration by AFSA (as described above), OWH commenced a lawsuit in the AIFC Court in Astana, bringing three claims (together the "**AIFC Claims**") per OWH's Amended Claim Form of 13 February 2026:

a. First, OWH seeks a declaration that the purported redomiciliation of Forum Muider from Cyprus to the AIFC was unlawful and an order setting it aside, including the removal of Forum Muider from the AIFC Public Registrar.

b. Second, OWH seeks recognition and enforcement of the Awards against Rusal in the AIFC.

c. Third, OWH claims damages for the harm caused by the conspiracy between Forum Muider, Miradore, Samruk, Primet and Rusal to shield Rusal's indirect interest in Bogatyr-Komir through the redomiciliation of Forum Muider and the collusive share allotment to Primet.

47. In parallel, on 7 November 2025, and amended on 24 December 2025, OWH applied for urgent interim relief to preserve the value and ownership structure of Forum Muider and its 100% subsidiary Bogatyr Komir, including a freezing injunction to prevent changes to the shareholding and corporate records of those entities pending final determination of the AIFC Claims.

48. OWH made several attempts to obtain targeted disclosure from the Defendants in the AIFC proceedings, but these efforts – in and out of court – have been unsuccessful so far. OWH applied for an order compelling AFSA and Forum Muider to produce documents regarding the redomiciliation and related communications, and sent formal requests to AFSA, FML, Miradore, Samruk, and Primet for documents and information concerning the Primet share issuance, the role of Metrade Overseas LLC, and the Samruk-Primet divestment agreement. The defendants either refused to produce the requested materials or failed to respond substantively, leaving OWH to proceed based only on public-registry information, limited disclosures from foreign proceedings, and reasonable inferences drawn from that material, significantly hampering its efforts of recognition and enforcement.

49. The proceedings are pending. In a hearing on 11, 12 and 15 May 2026, the AIFC Court heard the jurisdiction challenges of the defendants (except AFSA) and OWH's injunction application. OWH's disclosure application and other applications of the defendants have not yet been heard.

50. The following issues were debated during the hearing on 11, 12 and 15 May 2026 and the following necessarily cannot be a complete record of all arguments that were exchanged.

**a) Forum Muider's redomiciliation**

51. After Forum Muider's registration on 31 October 2025 (at which point its status was recorded as "active"), on 26 November 2025, the registration status in the Public Register was amended to "pending," with the following comment appearing: "Transferred from Cyprus on 31 October 2025. Conditional continuation: pending confirmation of strike-off from Cyprus."

52. The final part of this comment ("Conditional continuation: pending confirmation of strike-off from Cyprus") did not appear in any earlier version of the register entry. As I am advised by OWH's Kazakh counsel, the introduction of this qualification is significant. It reflects that AFSA has now acknowledged that its earlier notation suggesting that the re-domiciliation process had been completed, and the resulting classification of the entity as "active," were premature and inconsistent with the legal position arising from the Cypriot Administrative Court's decision of 30 September 2025. By adding this qualification, AFSA appears to seek to shield itself from the consequences of that earlier indication by making clear that the redomiciliation process remains unfinished unless and until the Cyprus Registrar confirms the strike-off.

**b) Primet share acquisition**

53. As for Primet's investment in Forum Muider, OWH has only been provided with a bare minimum of facts. Considering that Primet is an entity with no track record of owning a coal mine (or indeed any mine), it is inconceivable that there was no proper due diligence into the ownership (including the ultimate beneficial owner, "**UBO**") of Primet. Yet, Forum Muider's shareholders say nothing about such background investigations in the

AIFC proceedings. They allege that the First Deputy Prime Minister of the Republic of Kazakhstan received an investment proposal from Metrade Overseas LLC ("**Metrade**"), an affiliated entity of Primet, in July 2024, and that this proposal was allegedly in line with Forum Muider's and its shareholders' strategy to raise capital for investment in Bogatyr Komir. Nothing else is known about the negotiations or the due diligence process regarding Primet, which now purportedly holds (or is about to acquire) a significant interest in one of Kazakhstan's most valuable assets. It should be noted that Metrade was incorporated on 24 October 2023 in the Qatar Financial Center ("**QFC**"), merely approx. nine (9) months before sending the letter in July 2024 and offering to invest in Forum Muider.

54. Primet is a company also registered in the QFC. From the information available on the QFC Public Register, Primet's significant shareholders are Joseph Nazih Karam and Prime Mining and Energy FZCO, which appears to be a free zone company based in the UAE. It also appears that Primet was incorporated on 22 July 2025, during OWH's ongoing enforcement efforts. Mr. Karam is also the registered shareholder of Metrade. OWH has received a report by Alaco according to which Mr. Karam is a Lebanese individual who has experience as a banker and an offshore fiduciary provider, but not in the energy and mining sector. According to the Alaco report, he has a long-standing relationship with Mr. Deripaska, the (partial) UBO of Rusal, having worked closely together since the 1990s. Inter alia, Mr. Karam was convicted of mismanagement alongside Mr. Deripaska by the Swiss Supreme Court in 2008.

**aa) Rusal's knowledge of the breach of the Cyprus Freezing Orders**

55. OWH is advised by its Cypriot counsel that the Primet allotment breached the First Cyprus Freezing Order because the allotment's effect was to reduce Miradore's shareholding in Forum Muider from 50% to 35% and, with that, substantially depreciate the value of Rusal's shares in Miradore (see in more detail above). Miradore must have approved/authorized the Primet allotment because: (i) it was authorized by Forum Muider's board of directors, which included Miradore's appointees/representatives; and (ii) Miradore would have had to have waived its pre-emption rights in relation to the Primet Allotment. Since Miradore is a wholly owned subsidiary of Rusal, Rusal itself must have been aware of and approved/authorized the Primet allotment.

**bb) Allotment of shares to Primet at a significant undervalue**

56. Furthermore, there are strong indications that the shares in Forum Muider were allotted to Primet at a significant undervalue. The Forum Muider corporate register records show that 7,779 newly issued shares were allotted to Primet for an "amount paid or considered to be paid to the company" of EUR 55,272,615. This equates to approximately USD 65 million (based on the exchange rate applicable at the time of the allotment). The number of shares issued to Primet meant that as a result it held a 30% stake in Forum Muider.

57. By contrast, as demonstrated below, the financial records available to OWH show that Forum Muider and Samruk themselves have reported valuations for Forum Muider and Bogatyr Komir far exceeding the Primet entry price.

58. When those reported values are materially higher than the price at which a transaction is executed, the discrepancy calls for explanation. Based on an initial high-level assessment by Noerr, Counsel from Littleton Chambers and a quantum expert from Secretariat, it appears that the USD 65 million figure must include reductions that are difficult to understand or justify, even more if considering that Primet allegedly is to acquire the remaining 35 % of Samruk's shares in a next step, as allegedly already agreed between Samruk and Primet (the "**Divestment**", see also below).

59. Forum Muider's separate financial statements for the period ending 31 March 2025 carry Bogatyr Komir at USD 690 million at the holding-company level, implying roughly USD 198 million for a 30% block on a simple proportional basis – so the Primet price of USD 65 million reflects a discount of about 70% against Forum Muider's own figure.

60. Samruk's IFRS statements are equally telling. They carry its 50% interest in Forum Muider at approximately KZT 79,941,043,000 as of 31 December 2023 (about USD 175 million), KZT 79,401,647,000 as of 31 December 2024 (about USD 151 million), and KZT 87,548,832,000 as of 30 September 2025 (about USD 167 million). More notably, they do not record any commensurate impairment upon the September 2025 dilution. Prorating these carrying amounts would lead to a 30% holding to be in the order of USD 90–105 million, i.e. much higher than USD 65 million. The Samruk statement explicitly explains the dilution from 50% to 35% but retains the same book value in spite of the alleged share allotment to Primet.

61. Samruk, Miradore and Forum Muider each reported different carrying values for the same asset. While this is generally possible, it is notable, however, that all three carrying values are materially above the sale price. While accounting standards do not require uniformity, they merely prohibit carrying an asset above its market value. If they had assumed that the market value was not less than the sale price, no book value above USD 216 million can be explained (USD 65 million / 30 * 100). Still, all three reports show a higher value. It is implausible that the management of all three entities – Forum Muider, Samruk, and Miradore – deliberately and knowingly violated mandatory accounting standards in their respective (audited) accounts because they in fact believed that the sale price reflected the true market value. The far more likely inference is the reverse: they knew that their audited book values were defensible and that the price paid by Primet was too low.

62. Also, an independent valuation report by APC Audit Tax Advisory Limited, obtained by OWH, confirms the high actual value of Forum Muider's shares: a 30% stake is valued at approximately USD 100–123 million (Kazakhstan domicile) or USD 115–159 million (Cyprus domicile). Against these benchmarks, Primet's entry at approximately USD 65 million reflects a discount of 40 to over 60%.

63. On the face of these contemporaneous documents – two of which are Samruk's own audited and interim financials – no prudent board acting to maximize value would approve a 30% share issuance for approximately USD 65 million.

64. The only reasonable inference is that Samruk consented to an entry price designed to benefit Primet at the expense of the notionally incumbent shareholders (which

itself indicates and leads OWH to suspect that Primet is intimately connected with Mr. Deripaska and/or with Rusal) and/or that Samruk must have gained some other advantage.

65. As regards the impact on OWH's ability to enforce the Awards, that decision necessarily and foreseeably reduced Miradore's attachable asset base during a period when at least the First Cypriot Freezing Order was in force to preserve its value. In my view, this is a clear indicator that Samruk was fully aware of the valuation context and nevertheless facilitated an undervalued issuance whose economic effect was to transfer value to Primet and to diminish the recovery available to OWH.

**c) Samruk Divestment**

66. In the further course of the proceedings in Kazakhstan, OWH was informed by Samruk that Samruk is currently in the process of also selling its remaining 35% interest in Forum Muider to Primet pursuant to an agreement entered into on or around 29 December 2025 (the planned "**Divestment**"). OWH was notified about this agreement by a witness statement of Samruk dated 10 March 2026. This was four months after the commencement of the proceedings in Kazakhstan. This transaction appears to have been implemented in the knowledge that OWH was seeking orders from the AIFC that would prohibit such a transaction; but without notifying either OWH or the AIFC that Samruk was proposing to proceed with the transaction and potentially complete it before the AIFC was able to consider the injunction application. The reason why the Divestment has not occurred to date seems to be connected to the AIFC and/or Cypriot proceedings, but Samruk has refused to disclose any details.

67. Furthermore, there are several question marks surrounding this purported planned Divestment:

68. Samruk argues that the redomiciliation to the AIFC was done as an implementation of a Kazakh Presidential Directive of 2020 to repatriate companies holding key strategic state assets to Kazakhstan. If the true purpose of the redomiciliation was to comply with the Presidential Directive, there is some difficulty with reconciling this with a decision to sell Samruk's entire stake in such a strategic asset to a foreign private third party located outside Kazakhstan.

69. After 16 July 2025, Samruk was aware of both the Cyprus proceedings and the Cyprus Freezing Orders because OWH sent a letter to it summarizing the content of the First Cyprus Freezing Order and attaching the Second Cyprus Freezing Order. Samruk further knew or had constructive knowledge (through Forum Muider and/or Miradore and/or AFSA, at least as of 14 October 2025) of the preliminary injunction issued by the Administrative Court in Cyprus on 30 September 2025, by which it suspended execution and/or enforcement of the Cyprus Registrar's consent to the redomiciliation of Forum Muider.

70. The Board of Directors of Samruk apparently approved the purported planned divestment on 29 December 2025, i.e. a transaction by which Samruk would effectively alienate all its remaining shares in Forum Muider.

71. OWH seeks the injunction also in relation to the Samruk Divestment, for the following reasons:

72. OWH is currently applying to the Cypriot Courts for the appointment of a receiver over Miradore. The purpose of that appointment is for that receiver to take control

over Miradore's shares in Forum Muider; supervise compliance with the First and Second Cyprus Freezing Orders until the recognition proceedings in Cyprus have been finally decided and, after recognition by the Cypriot court; sell those shares; and use the proceeds of sale to meet some or all of the sums due to OWH under the Award.

73. A sale of Samruk's remaining 35% interest in Forum Muider would result in Primet acquiring a majority shareholding in Forum Muider. This would (further and significantly) reduce the value of Miradore's shares in Forum Muider (and, therefore, the proceeds of their sale that would be available to discharge what is due to OWH under the Award), because it would mean that instead of Forum Muider being owned by three owners with Miradore having the highest number of shares jointly with Samruk, it would be controlled by one shareholder (Primet) able to override Miradore's voting rights in the company. A minority shareholding vis-à-vis a majority shareholder has even less value than a (joint) majority shareholding (that would still result in a veto right).

74. Moreover, and importantly, if Miradore has waived its pre-emption rights in relation to this proposed sale of Samruk's remaining Forum Muider shares to Primet (and, in fact, to the Primet allotment), that would have breached the First and Second Cyprus Freezing Order, because the resulting diminution in the value of Miradore's shares in Forum Muider (which that waiver would have caused) is also expressly prohibited by the Second Cyprus Freezing Order.

75. Alternatively, if Miradore has not waived its pre-emption rights, the divestment would breach the pre-emption rights. This would have a prejudicial effect on OWH because

of the detrimental effect this has on the value of Miradore's shares in Forum Muider against which OWH wishes to enforce the Award.

**2. Enforcement in Qatar**

76. OWH initiated proceedings before the Civil and Commercial Court of the QFC, First Instance Circuit, also referred to as the Qatar International Court, ("**QIC**") because, as explained in more detail below, in about March or April 2025 Rusal transferred all its directly held shares in AL Plus Holding to its Russian-incorporated subsidiary International Limited Liability Company Gershvin ("**Gershvin**") in what OWH believes to be another attempt to avoid enforcement of the Awards.

77. On 18 and 19 November 2025 respectively, OWH filed a claim and an application for injunctive relief before the QIC seeking relief under Article 133 of the QFC Companies Regulations, including: (i) a declaration that the share transfer in AL Plus Holding is invalid; (ii) an order setting aside that share transfer; (iii) an order directing the Companies Registration Office ("**CRO**") to amend the QFC Public Register to record Rusal as the sole shareholder of AL Plus Holding; and (iv), in the alternative, an order for damages in an amount reflecting the total sums awarded to OWH under the Awards.

**a) Gershvin transfer**

78. AL Plus Holding is an important entity within the Rusal group, as evidenced by the following entities it holds outside the QFC:

a. AL Plus Global FZCO, which is registered in the UAE and handles aluminium materials exported by the Rusal group around the world.

b. AL Plus Trading FZCO, which is also registered in the UAE and is involved in handling ancillary aluminium-related products exported by the Rusal group around the world.

c. Libertatem Investments Limited, which is registered in Cyprus. This entity serves as a holding company for other entities within the Rusal group.

d. Libertatem Materials, which is also registered in Cyprus. This entity also serves as a holding company for other entities within the Rusal group.

79. The transfer of Rusal's stake in AL Plus Holding to Gershvin occurred at some point between March and April 2025. This view is based on the information from Rusal's corporate filings, which showed that Rusal was the direct, 100% shareholder of AL Plus Holding prior to 1 April 2025. Further, Rusal's Accountancy Annual Report 2024 showed that, "in March 2025 [the AL Plus Holding] made a decision to pay [Rusal] over RUB 155 billion (described in the report as $1,739,013,000, i.e. $ 1.74 billion) in dividends".

80. The consideration, if any, paid by Gershvin to Rusal for the Share Transfer is unclear. Rusal's financial report for Q1 2025 did not record any income as having been received by Rusal resulting from a sale of shares in its subsidiary organisations.

**b) UC Silicon and UC Foil redomiciliation and transfers**

81. On or around 19 February 2025, Rusal further redomiciled two of its group companies from Cyprus to Russia. Those entities are United Company Rusal Silicon Limited ("**UC Silicon**") and United Company Rusal Foil Limited ("**UC Foil**").

82. UC Silicon was owned by Libertatem Materials, whereas UC Foil used to be owned by AL Plus Holding. Based on Rusal's Accountancy Annual Report 2024, Rusal

acquired UC Silicon for RUB 10.03 billion (USD 117.92 million), and UC Foil for RUB 8.09 billion (USD 95.13 million). The value of both companies appears to have been substantially inflated. According to their respective annual reports for 2023, UC Silicon had total assets of USD 12.64 million, while UC Foil's assets were also approximately USD 12.64 million. As such, the value of the assets of each of those entities increased by eight to ten times between December 2023 and March 2025. The corporate filings do not provide any clear reasons for this enormous increase in valuation.

83. In addition, the payment of the consideration for the transfer of UC Silicon and UC Foil, to their respective previous owners (Libertatem Materials and AL Plus Holding), was not expressly referenced in Rusal's Accountancy Annual Report 2024.

84. The UC Silicon and UC Foil redomiciliation and transfers occurred at or around the same time that Rusal transferred its shareholding in AL Plus Holding to Gershvin. In other words, Rusal took steps to shield its assets in Qatar, because they were held directly in its name, and its assets in Cyprus, and transferred them to its wholly owned Russian subsidiary, Gershvin.

**c) Interim relief and developments in the QIC proceedings**

85. On 26 November 2025, the QIC granted an injunctive order against AL Plus Holding as applied for by OWH. The QIC Order prohibited any transfer of Gershvin's shares in AL Plus Holding to any other entity and any transfer or other disposal of shares AL Plus Holding holds directly or indirectly in its subsidiaries in the QFC, UAE and in Cyprus.

86. On 29 March 2026, the QIC issued two judgements: (i) on jurisdiction: dismissing AL Plus Holding's jurisdictional challenge; and (ii) on OWH's injunction applications: confirming the QIC Order dated 26 November 2025 and extending it to also prohibiting AL Plus Holding, inter alia, from receiving, assigning, transferring, disposing of or otherwise dealing with, or diminishing the value of, any monies paid or payable to it by way of repayment of any loans advanced to Limerick, UC Rusal Marketing and Libertatem Materials. The proceedings with regard to the claim remain pending.

**d) New information from AL Plus Holding's Defence**

87. Based on the Defence of AL Plus Holding filed on 7 May 2026 ("**Defence**"), OWH has now learned for the first time specific details about both the purported commercial rationale for, and the mechanics of, the share transfer from Rusal to Gershvin. In particular, AL Plus Holding now alleges that the transfer formed part of a tax-driven group restructuring prompted by changes to the Russian IHC regime, and that it was implemented pursuant to a Share Purchase Agreement dated 17 March 2025 for a purchase price of RUB 452,850,310,142.67, said to have been paid in full on 11 December 2025.

88. The Defence further discloses that AL Plus Holding instructed its QFC corporate services provider, Tempus Venture Partners, on 18 March 2025 to implement the QFC law steps, that a "General Submission" was filed via the QFC Client Portal on 25 March 2025, and that on 26 March 2025 the CRO requested additional documents, including (i) a certified copy of the constitutional documents (AOA/MOA) of the transferee shareholder and (ii) the transferee's last two years of audited financial statements.

89. According to the Defence, these documents were filed on 9 April 2025; the CRO then closed the submission on 13 April 2025 and updated the public register on 14 April 2025 to show Gershvin as the sole shareholder of AL Plus Holding.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 15 May 2026
Berlin, Germany

____________________________
Meike von Levetzow